**William J. ROCHELLE, Jr., Trustee in Bankruptcy of Estate of Angus G. Wynne, Jr.**

v.

**UNITED STATES of America (two cases).**

**Civ. A. Nos. 3–3398 and 3–6146.**

United States District Court, N. D. Texas, Dallas Division.

Nov. 15, 1973.

Linda N. Coffee, Palmer, Palmer & Coffee, Dallas, Tex., for plaintiff.

Frank D. McCown, U. S. Atty., Martha Joe Stroud, Asst. U. S. Atty., William W. Guild and Charles G. Barnett, Tax Div. Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

These consolidated suits involve not only identical parties, but also the same essential question: who is entitled to possess an income tax refund of nearly a third of a million dollars. For reasons detailed in the pages that follow, I have decided that the United States acted correctly in setting off the refund against other taxes for which the taxpayer was liable.

The refund [1] on the 1962 Federal income tax of Angus G. Wynne, Jr., and his wife results from a loss carryback from 1964 directly attributable to losses sustained in 1964. Wynne was a joint venturer in Wynne-Compass Fair, Inc. (hereafter abbreviated to the Fair), which operated the financially unsuccessful Texas Pavilion at the New York World's Fair in 1964.

In September of 1964, involuntary bankruptcy proceedings were filed against Wynne in Dallas, his home town. The following September, while the bankruptcy case was still open (indeed, it still *is* open [2]) the Wynnes filed a

---

1. The amount of the refund is $325,380.97 plus interest of $1,556.95, totaling $326,947.92.

2. Wynne v. Rochelle, 385 F.2d 789 (5th Cir. 1967) reversed the district court's adjudication of Wynne as a bankrupt and remanded

claim for refund on their 1962 income tax in the amount mentioned in note 1. They make no claim to the money, having consented to have the refund credited to the unpaid federal taxes [3] owed by the Fair[4]. The plaintiff Rochelle, however, in his capacity as Wynne's bankruptcy trustee, filed an identical claim in January of 1968 and now contends that the refund should have been paid to him for the use of the bankrupt estate, not used to satisfy the partnership's federal tax obligation.[5]

■ Initially, then, this Court is called upon to decide whether the United States acted rightly or wrongly in setting off the unpaid taxes of the partnership against the refund due to Wynne individually.[6]

Both parties cite—but reach different conclusions from—section 68 of the Bankruptcy Act (11 U.S.C. § 108). The text is quoted in the margin,[7] but in essence the statute provides simply that if there are mutual debts between a bankrupt and a creditor, the account shall be stated and one debt shall be set off against the other with only the balance being paid. The section requires the existence of mutual debts, and that the debt due from the bankrupt be provable.

Plaintiff contends that the statute is permissive rather than mandatory, despite its language, and that at any rate the debts and credits must be between the same parties standing in the same capacity. Plaintiff also cites the familiar general rule that the joint debts (here, the tax obligation of the Fair) cannot be set off against separate debts (the refund owed by the United States to Wynne's bankruptcy estate) and separate debts cannot be set off against joint debts.

The defendant, on the other hand, maintains that "mutual debts" exist even where a creditor (the Government) of a bankrupt partnership (the Fair) [8] owes a debt to *one* of the partners (Wynne).

In addition, Rochelle quotes section 5(g) of the Bankruptcy Act (11 U.S.C. § 23), dealing with partnerships, which says that net proceeds of partnership property shall be appropriated to the payment of partnership debts; and the net proceeds of the individual estate of each general partner, to the payment of his individual debts. Any surplus remaining in either estate is to be applied against the other estate's debts. This statute, Rochelle insists, is mandatory and precludes the offset, because the income tax refund claim was an individual asset while the Fair's tax obligation was a partnership liability.

---

for a jury trial on the question of the exact date of bankruptcy, which has not been held. The Court's opinion explains much of the historical basis of the present litigation.

3. While operating, Wynne-Compass Fair, Inc., incurred liability for the employer's portion of Social Security (F.I.C.A.) taxes, the amount withheld from employees' pay for Social Security and income taxes, Federal Unemployment Tax Act taxes and excise taxes totaling $349,679.02.

4. Wynne-Compass Fair, Inc., was adjudicated bankrupt Aug. 18, 1964, following voluntary Chapter XI proceedings.

5. In No. 3398, Plaintiff sued to recover a claimed overpayment in the Wynnes' 1962 income tax. In No. 6146 he sued for a refund of the amount credited against the tax obligation of Wynne-Compass Fair, Inc.

6. The Wynnes apparently filed a joint tax return primarily because of Texas community property laws. For our purposes, Wynne will be treated as the sole taxpayer.

7. "a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate . . . or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy."

8. Treasury Regulations on Income Tax sec. 301.7701-3(a) treat a joint venture as a partnership for tax purposes.

I have concluded that the parties did hold mutual debts and that the Government's claim against Wynne was provable in bankruptcy. The setoff, then, was proper.

The Bankruptcy Act with which we deal here is certainly not of recent vintage, but cases predating it support the Government's contention that Wynne and the Government held mutual debts. Tucker v. Oxley, 9 U.S. 34 (5 Cranch 34) 3 L.Ed 29 (1809); Gray v. Rollo, 85 U.S. 629 (18 Wall. 629), 21 L.Ed. 927 (1873). More recent and more on point, however, is In re Sherman Plastering Corp., 346 F.2d 492 (2d Cir. 1965), a case dealing specifically with section 68 of the current act (and interpreting the *Tucker* and *Gray* cases). Sherman, like the Fair, was allowed for a time to operate its business as a debtor-in-possession following the filing of a petition for a Chapter XI arrangement. Sherman was a judgment creditor of three companies which were held jointly liable. One of the three sought to pay its pro rata share of the judgment by offsetting it by an unrelated debt due to it from Sherman. Sherman resisted the setoff, as Rochelle does here, by invoking the maxim that a joint debt (the one owed by the company) cannot be set off by a single debt (the debt owed by Sherman). Circuit Judge Marshall wrote:

> No legitimate interest would be served by disallowing this set-off, and in fact disallowing the set-off would frustrate the manifest equitable purposes of section 68. It would put Hanover [the company] in the inequitable position of having to pay its debt to Sherman in full while receiving only partial satisfaction of its claim against Sherman. Neither the rehabilitative purposes of a Chapter XI arrangement nor section 68's requirement that the debts be mutual dictates such a result.

> \* \* \* \* \* \*

The venerable maxim that a joint debt cannot be set off against a separate debt, and vice versa, . . . like all maxims tested by experience, has its exceptions, and this is one of them. 346 F.2d at 493, 496–497.

The same court in an earlier case chose to adhere to the maxim rather than its exception and Rochelle naturally points to the case, In re Neaderthal, 225 F. 38 (2d Cir.), cert. denied, 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499 (1915), as holding that a partnership creditor cannot discharge an obligation owed to one of the partners individually by setting off the debt owed to the creditor by the partnership. But as Judge Marshall said of another aspect of *Neaderthal*, ". . . to the extent that it is so read, we choose not to follow it." In re Sherman, supra, 346 F.2d at 495. The *Neaderthal* opinion does not mention, let alone distinguish, the earlier conflicting cases of *Tucker* and *Gray,* supra. In *Sherman,* Judge Marshall questioned the reasoning of *Neaderthal,* found it inconsistent with precedent and, as mentioned above, declined to follow it. I also decline to follow it.

By offsetting the taxes due it against the refund payable to Wynne, the Government is being paid more than other creditors of the same or prior class. The same situation was presented in In re Inland Waterways, 71 F.Supp. 134 (D.Minn.1947). There the U. S. Navy owed money to the bankrupt shipbuilder, but instead of paying the full sum owed, the Government deducted the amount owed by the firm for its workers' employment and withholding taxes. The district court recognized that the setoff created a preference for the Government, but held (over the trustee's protest) that the offset was proper.[9]

In addition to the existence of mutual debts, section 68 also requires that the claim be provable in order for a setoff to be proper. In Lewis v. United States, 92 U.S. 618, 23 L.Ed. 513 (1875), a partnership that was indebted to the Government was bankrupt, as were the partners individually. The Supreme Court

9. This holding was not affected in the reversal, on the Government's appeal, of the case.

United States v. Fogarty, 164 F.2d 26 (8th Cir. 1947).

found that the partnership's debt was also a debt owed by the individual partners:

> The court below committed no error in holding that the preference of the United States, as a creditor of [the bankrupt partnership] applied to the separate and individual estates of the bankrupt partners; thus superseding the rule in equity recognized by the Bankrupt Act, that partnership property is to be first applied in payment of the partnership debts, and individual property in payment of the individual debts. 92 U.S. at 624, 23 L.Ed. 513.

 It is inherent in the Court's decision that a partnership's debt is a "provable debt" against the individual bankrupt partners. I find that the Government was a creditor of Wynne's individual estate in bankruptcy, just as it was a creditor of the Fair's estate in bankruptcy. And the Government's claims against Wynne for the unpaid taxes of the Fair were provable in his individual estate.

Because Wynne's tax refund claim for 1962 and the Government's claim against him for the Fair's taxes were "mutual debts," and because the Government's claim against Wynne for the Fair's taxes was provable in bankruptcy, then the Government may set off the two amounts in accordance with § 68(a) of the Bankruptcy Act.

██ Rochelle insists that no matter what § 68 says, § 5(g) has priority over all conflicting considerations and requires allocating the assets between partnership and individual creditors.[10] To allow a setoff, says Rochelle, would be unfair to Wynne's creditors under the rule of distribution of § 5(g) requiring that individual creditors, not partnership creditors, should have priority in the bankrupt partner's individual estate. The Government, answering this contention, cites Francis v. McNeal, 228 U.S. 695, 33 S.Ct. 701, 57 L.Ed. 1029 (1913), a case involving an individual partner's liability *vel non* for debts of a bankrupt partnership. The Court found it true that

> partnership debts are debts of the members of the firm, and that the individual liability of the members is not collateral like that of a surety, but primary and direct, whatever priorities there may be in the marshaling of assets. 228 U.S. at 699–700, 33 S.Ct. at 702.

*Francis* would suggest, then, that § 5(g) does not affect Wynne's debt to the Government; its claim against him individually for the Fair's unpaid taxes is a valid one. Section 5(g), instead, simply establishes a statutory priority of payment by marshaling assets. The section does not interfere with the setoff permitted by § 68(a)—not even if § 68(a) operates to permit a preference by allowing one creditor to be paid more than another creditor of the same or a higher class. See In re Inland Waterways, *supra.*

Since Rochelle, as noted in the preceding paragraph, is concerned with what is fair to Wynne's creditors, it is appropriate at this point to acknowledge that the Court need not close its eyes to the relative equities in this situation. *See* Gardner v. Chicago Title & Trust Co., 261 U.S. 453, 43 S.Ct. 424, 67 L.Ed. 741 (1923); 9 Am.Jur.2d Bankruptcy § 512

---

10. "Sec. 5. Partners . . . .

"(g). The net proceeds of the partnership property shall be appropriated to the payment of the partnership debts and the net proceeds of the individual estate of each general partner to the payment of his individual debts. Should any surplus remain of the property of any general partner after paying his individual debts, such surplus shall be added to the partnership assets and be applied to the payment of the partnership debts. Should any surplus of the partnership property remain after paying the partnership debts, such surplus shall be distributed among the individual partners, general or limited, or added to the estates of the general partners, as the case may be, in the proportion of their respective interests in the partnership and in the order of distribution provided by the laws of the State applicable thereto."

(1963). The Government counters that if equity is to be considered, the Court should recognize the inequity of requiring the Internal Revenue Service to refund $326,947.92 in full to Wynne while Wynne postpones paying the Government the Fair's taxes until all other creditors of his estate have been paid. When it is remembered that Wynne would have no refund coming at all but for his misadventures with the New York World's Fair—misadventures that led to the partnership's debt to the Government—the inequity mentioned by the Government becomes more acute. It hardly seems like fair play to the Court to pour a third of a million dollars into Wynne's estate in bankruptcy for creditors' benefit while simultaneously requiring the Government to take its place in line to try to recover the taxes due it from Wynne as a partner in the Fair. In sum, then, the equities are with the Government.

■ On another tack, Rochelle challenges the propriety of the setoff because, he says, the Government has not pursued to the end the partnership proceedings to satisfy its tax claim. It appears to the Court that the Government does have a claim in the partnership proceeding—although for only $72.76. Previously the amount claimed there was in excess of $2 million. I decline to require the Government to exhaust the partnership funds before asserting its claim against Wynne individually because of the uncertainty that the Government could collect anything at all in that manner. Moreover, I find no impropriety in the Government's reduction of its claim against the partnership funds. The initial $2 million claim was based on estimated liabilities which subsequently were reduced to approximately those at issue in this case. After the Government applied the setoff, there was no need for it to continue asserting its claim for that amount in the bankruptcy proceeding.

## II.

■ On January 2, 1968, Rochelle (as bankruptcy trustee for Wynne) signed an IRS Form 870, "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Over-assessment." Although Rochelle testified that he did not *intend* to waive the estate's claim to the tax refund, the Government could hardly be expected to know what Rochelle's intent was or was not. Instead, the Government took the form for what it purported to be: an agreement that the amount of Wynne's overpayment of his 1962 income taxes was to be applied against the Fair's unpaid taxes. Acting in reliance on this agreement, the Government then changed its position to its detriment by reducing its claim in the partnership proceedings to $72.76. Rochelle is estopped from repudiating his agreement, regardless of his intent or lack of intent at the time of executing the agreement. This conclusion is largely academic, however, since the discussion in Section I, *supra,* actually determines the outcome of this case.

## III.

■ Rochelle next contends that Wynne individually cannot be charged with the various federal taxes which fell due after July 16, 1964, the date that the Fair's Chapter XI proceeding was begun. Rather, he says, those taxes are only costs of administration in the partnership proceeding. Rochelle cites Standard Oil Co. of New Jersey v. Elliott, 80 F.2d 158 (4th Cir. 1935) as support for his argument that Wynne's individual creditors may not be forced to bear administrative costs incurred by the partnership during the weeks it was debtor-in-possession. The Government correctly challenges the relevance of that case to this one. Here Wynne did not become involved in individual bankruptcy proceedings until some time *after* the Fair's Chapter XI proceeding was filed. The Chapter XI matter in no way insulated Wynne individually from liability for taxes incurred by the Fair as debtor-in-possession. In *Standard Oil* (which apparently was not a bankruptcy case), the court disallowed a setoff of a

pre-existing debt owed to a tenant by a landlord against rent owed by the tenant to the landlord bank after the bank was in receivership.

As a variation on this theme, Rochelle says that the Court ought to apportion the Fair's taxes that arose after July 16, 1964, on the basis (apparently) of the time the Fair operated as debtor-in-possession. In other words, to take the Federal unemployment taxes as an example, one of Rochelle's contentions is that about one-seventh ($8,102.11) of the Fair's 1964 taxes in this category ($56,714.79) are administration expenses. He fails to explain from whence came the fraction of one-seventh, but the Court will go along with the Government's educated assumption that it is derived from the fact that the Fair operated as debtor-in-possession for about one month of the seven months in 1964 ending with the liquidating bankruptcy. But an allocation based on time alone, even if sufficiently precise, would not necessarily be a correct allocation of Federal unemployment taxes because there is no evidence that the partnership's payroll was level throughout the seven months. Given the financial problems the partnership was having, it would seem logical that the employment probably dropped off toward the end. At any rate, Rochelle has failed to carry his burden to establish every element of his claim for a refund of taxes paid. Helvering v. Taylor, 293 U.S. 507, 55 S. Ct. 287, 79 L.Ed. 623 (1935).

## IV.

The final question is whether Rochelle is correct in maintaining that one-half of certain of the Fair's unpaid taxes that were set off should be disallowed because Wynne and the Fair are equally responsible for them, and that it would be inequitable to Wynne's estate's creditors to use the estate's assets to satisfy the partnership's share of the taxes. Not only is Rochelle unable to cite more than a footnote to support his argument,[11] but also he fails to explain why he thinks Wynne's obligation is anything other than joint and several. I see no reason in equity or otherwise that the Government could not collect the partnership's taxes in full from Wynne, a partner, under the circumstances. I believe this has been sufficiently discussed above.

The United States is entitled to set off the entire amount of its claim against Wynne for the Fair's taxes against the income tax refund due to Wynne individually.

Judgment will be entered for the defendant. Defendant's lawyers are requested to submit appropriate form.

---

11. In re Sherman Plastering Corp., 346 F.2d 492, 496 n. 3 (2d Cir. 1965).